# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0321-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

T.T.B.,

      Defendant-Appellant,

and

B.L.M.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF B.T.M.,
and Y.L.M.,

      Minors.

_____

Submitted June 25, 2019 – Decided July 25, 2019

Before Judges Rothstadt and Suter.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0029-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Steven Edward Miklosey, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Peter C. Thambidurai, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors B.T.M. and Y.L.M. (Rachel E. Seidman, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant T.T.B. (Theresa)[1] appeals from the Family Part's September 4, 2018 Judgment of Guardianship terminating her and B.L.M.'s (Benjamin)[2] parental rights to B.T.M. (Brittany) and Y.L.M. (Yosef), who were ten and thirteen years old respectively at the time of trial. On appeal, Theresa challenges the trial judge's findings as to prongs three and four of the best interests of the child test, N.J.S.A. 30:4C-15.1(a). She argues that the Division did not prove

---

[1] Pursuant to Rule 1:38-3(d), we use initials and fictitious names to protect the confidentiality of the participants in these proceedings.

[2] Benjamin has not filed an appeal.

the third prong because it "failed to complete its assessment of" one of her out-of-state relatives, "did not give adequate weight to the children's expressed wishes" to live with that relative and, as to the fourth prong, erred in finding that termination would not do more harm than good because the Division did not assess the relative as an alternative and the children did not have a "warm relationship" with their resource parent. We find no merit to these contentions. We affirm because we find substantial credible evidence in the record to support the judge's determination.

The facts as developed at trial are summarized here and focus only upon those relating to Theresa's challenge. After Brittany was born and tested positive for cocaine, Theresa left the residence where she lived with the children and Benjamin pursuant to a Safety Protection Plan the family agreed to with plaintiff, the Division of Child Protection and Permanency (Division), that placed the children in Benjamin's custody and care. Thereafter, in 2015, the Division removed the children from Benjamin's care after an incident involving Benjamin being intoxicated and exposing the children to a dangerous smoke hazard in the home. As a result of that incident, Benjamin was arrested for endangering the welfare of the children and the Division attempted to locate family members who would care for the children.

3

Initially, the Division attempted to contact C.B., the children's biological sister, and W.B., the children's maternal great-grandmother, to no avail. An investigator contacted S.W., Theresa's biological sister, who stated that she was willing to care for the children, but later advised that her home could not accommodate them. Later that day, investigators were able to get in touch with W.B., who reported that she was willing to provide care, but lived in a one-bedroom apartment with her husband. An investigator contacted B.M, the children's paternal grandmother, who informed that she was not able to care for the children, but provided the telephone numbers of her adult children, L.M. and T.M. (Terrence), the children's biological paternal aunt and uncle.

An investigator also received a phone call from Theresa, who stated that she was willing to have the children placed in her home. Theresa also requested that the Division consider her aunt, S.V. (Samantha), as a placement option. Samantha, who lived in Pennsylvania, stated that she was willing to care for the children.

As the Division could not immediately locate any suitable relative caregiver for the children, it served Theresa with notice of its intent to conduct

4

an emergent "Dodd"[3] removal and place the children with a non-relative resource family. In response, Theresa again stated that the children had not lived with her for two years but that she was interested in the children residing with her. Theresa claimed that she had a history of substance abuse but had been sober for over seven years. She was open to a substance abuse evaluation and agreed to submit to a urine drug screen. The children were placed in a non-relative resource home that night.

Thereafter, the Division attempted to evaluate and treat Theresa's drug addiction issues, but they were not successful. On October 7, 2015, Theresa completed a urine drug screen which tested positive for Phencyclidine (PCP). Theresa was referred for a substance abuse evaluation on October 30, 2015, which she failed to attend, and her appointment was rescheduled for November 9, 2015, which she also did not appear for. At the time of trial in 2018, Theresa had not engaged in any substance abuse treatment.

---

[3] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974." N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

After engaging in a supervised visitation session with Theresa on October 9, 2015,[4] the Division was able to place the children with their paternal uncle Terrence and his wife, Ellen. They remained there until June 2017.

In December 2015, the Division's permanency plan was for reunification with Benjamin, who had been completing a substance abuse program. In July 2016, however, Benjamin relapsed, was evicted from his home, and began living with his mother in an over fifty-five community where the children would not be able to reside.

In December 2016, while the children remained in Terrence's home, he indicated that he would consider kinship legal guardianship (KLG) but not adoption. As a result, at a March 23, 2017 permanency hearing, the Division's plan changed from reunification to KLG with Terrence, which the judge approved. However, on April 3, 2017, Terrence and Ellen advised the Division that they would no longer be able to care for the children. On June 23, 2017, the children left Terrence and Ellen's home and were placed with a non-relative resource parent.

---

[4] Despite the Division's efforts to continue Theresa's supervised visits with the children, the October 9, 2015 visit proved to be the only visit that Theresa attended prior to the trial. She also failed to attend scheduled family team meetings or provide the Division with her contact information.

After the children were removed from Terrence's home, and prior to filing the guardianship complaint on January 12, 2018, the Division began assessing other family members for possible placement. In July 2017, an Interstate Compact on the Placement of Children (ICPC) investigation began into Samantha, whom the children expressed an interest in being placed with. By January 2018, however, Samantha had still not provided the necessary paperwork and was informed that failure to do so within two weeks would result in the denial of the ICPC. As of June 4, 2018, the Division was still not able to approve Samantha due to various missing information and background checks.

At a June 18, 2018 Case Management Conference, the Court Appointed Special Advocate stated that she had

> one concern about the maternal aunt who . . . has filled out some of the paperwork to be considered as an adoptive home. It's taken quite a long time for her to fill out what she has and there are a number of items outstanding. And to my knowledge, she hasn't made an effort to have visits with the children over this past year. So I just am concerned about her seriousness of becoming an adoptive parent.

Samantha never completed the ICPC process and could not be approved as viable alternative placement for the children.

In anticipation of the guardianship trial, the Division referred Theresa for psychological and parenting capacity evaluations with Dr. Brian S. Eig on

A-0321-18T2

March 23, 2018 and July 9, 2018, both of which she failed to attend. On April 24, 2018, Dr. Eig conducted bonding evaluations of the children with their resource mother. As to Brittany, Dr. Eig concluded that "[a]lthough [she] and [the resource mother] appear to have a strong and positive relationship, given the limited tactile contact/physical affection observed, their relationship does not appear very warm" and Brittany "would be at relatively low risk of suffering severe and enduring psychological or emotional harm if her relationship with [the resource mother] was permanently ended." Dr. Eig's findings and recommendations regarding Yosef were similar. Since reunification with Benjamin was not recommended at that time, Dr. Eig supported adoption by the resource mother.

A two-day guardianship trial was held in August 2018 before Judge Rodney Thompson. The Division's plan was termination of parental rights followed by adoption by either the resource mother or Samantha. At the trial, a police officer who was involved with the 2015 discovery of the children that led to their removal from Benjamin testified for the Division. Next, the Division's caseworker, Kristen Stout, testified for the Division. Stout was assigned to the case in February of 2018. Stout described Theresa's refusal to stay in contact with the children or the Division, attend court proceedings, or engage in

substance abuse treatment. Stout also explained that at the January 2018 hearing, which Theresa attended, she was ordered to come to the local offices to arrange services, but failed to do so.

As to Samantha, Stout testified that she "took almost a year . . . to complete the packet which includes medical appointments, background checks, and she wasn't giving in the paperwork that needed to be handed in in a timely manner." At the time of trial, Samantha had not been "ruled out" as a placement option, but she had not visited with the children throughout the pendency of the Division's involvement. She also stated that the resource mother was willing to adopt them and the children wished to be adopted by their resource mother.

Finally, Dr. Eig testified as an expert in the field of psychology. Dr. Eig stated that in his opinion, "it would be in the best interest[s] for the children to remain with their current resource parent who has expressed an interest in adopting them if legally free to do so." Dr. Eig noted that the resource mother was taking care of the children's needs and was open to them having contact with Benjamin and their biological family if it is safe to do so. Dr. Eig's opinion was that delaying permanency in order to provide Benjamin an opportunity to overcome his issues would "absolutely" increase the risk of harm to the children, as "[t]his case has been going on now for about three years where the children

have been in sort of a state of limbo." When asked about Theresa, Dr. Eig indicated that neither child mentioned her during their bonding evaluations with their resource mother and that the resource mother indicated that the children do not discuss Theresa at home.

Theresa also testified. Her testimony was brief, as she stated only her address and that she would be beginning a job the following week.

On August 31, 2018, Judge Thompson signed the guardianship judgment that terminated Theresa's parental rights to the children. The judge set forth his reasons in a comprehensive fifty-one page written opinion. Initially, the judge made specific credibility findings as to the Division's witnesses. Next, after summarizing the family's history, the judge found that the Division proved by clear and convincing evidence all four prongs of the best interests of the child test.

As to prong one, Judge Thompson found that the children's safety, health, and development have been and will continue to be endangered by a relationship with Theresa due to Theresa's continued use of illicit substances, absence from the children's lives for two years, and failure to complete substance abuse evaluations, visit with the children, or complete any services offered by the Division. Prong two was satisfied because in the course of a nearly three-year

litigation, Theresa failed to complete any substance abuse or psychological evaluations, and her "approach to th[e] litigation and to her relationship with her children, . . . clearly demonstrate[d] her lack of interest" in overcoming these issues.

Addressing the third prong, the judge emphasized that the Division offered Theresa numerous services to help remedy her substance abuse issues so that the children could be placed in her care following their removal, including "substance abuse evaluations, mental health evaluation referrals, referrals for psychological and bonding evaluations, and supervised visitation." Even after Theresa ceased communicating with the Division, it "initiated a search for her so that it could attempt to re-engage her in services."

As to the second part of prong three, the judge found that the Division considered alternatives to termination of Theresa's parental rights and placement with identified relatives. For two years after the children's removal, the children were placed with relatives and the permanency plan was reunification, which changed to KLG only after Theresa's prolonged absence from the litigation and Benjamin's continued alcohol abuse and housing instability. The Division also considered placement with Samantha. He found that although the ICPC requests were made in 2017, Samantha did not complete her application or provide the

11

required information for her to be assessed.  He found that in June 2018, the Division learned that Samantha's home could not be approved because she still had not completed the required paperwork, fingerprinting, background check, or a physical, and had not supplied her income information.  The judge concluded that despite the Division's efforts and years that elapsed since their initial removal, it was apparent that Samantha "delayed in submitting her paperwork and showed little interest in caring for the children through the duration of the litigation."

Finally, turning to prong four, the judge observed that Theresa failed to attend either of two scheduled psychological and bonding evaluations and at the time of trial, had not seen either of the children except once at a family member's funeral in 2017.  The judge considered this "prolonged absence" in considering Theresa's bond with the children.  Judge Thompson stated that Theresa "essentially terminated her own parental rights as she has absented herself from the children's lives for the clear majority of an almost three-year period . . . [and] since she re-surfaced in January 2018, she still has not made any clear effort to re-establish her relationships with [the children]."  Terminating Theresa's parental rights would therefore not do the children more harm than good and

would provide "the stability, security, safety, and true permanency they require to develop and mature into . . . successful adults."

On September 4, 2018, Judge Thompson filed the Judgment of Guardianship terminating Theresa's parental rights. This appeal followed.

On appeal, our review of the trial judge's decision is limited. We defer to his expertise as a Family Part judge, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and his decision to terminate parental rights will not be disturbed so long as "there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).

Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982). "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights . . . ,' and 'rights far more precious . . . than property rights.'" Stanley v. Illinois, 405 U.S. 645, 651 (1972) (alterations in original) (citations omitted). "[T]he preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare . . . ." N.J.S.A. 30:4C-1(a); see also In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999).

The constitutional right to the parental relationship, however, is not absolute. K.H.O., 161 N.J. at 347. At times, a parent's interest must yield to the

13

State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining whether a parent's rights must be terminated in the child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

See also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986).

Under the third prong, after the Division accepts a child into its care or custody, it has a statutory obligation to "initiate a search for relatives who may be willing and able to provide the care and support required by the child." N.J.S.A. 30:4C-12.1(a). If the Division "fails to comply with its obligation [under N.J.S.A. 30:4C-12.1], the judicial determinations that follow are made without information relevant to the best interests of the child." N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 582 (App. Div. 2011). However, "there is no presumption in favor of placement with relatives." Id. at 580. Only when the Division has been "lax or capricious in its assessment" of a timely presented relative should the court conclude that the Division has failed to prove by clear and convincing evidence that alternatives to termination of parental rights were appropriately considered. N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super 69, 87 (App. Div. 2013).

Under the fourth prong, a judge must also balance the injury a child might suffer if parental rights are terminated against the harm the child may suffer if removed from his or her foster placement. K.H.O., 161 N.J. at 355; see also E.P., 196 N.J. at 108. The judge is permitted to rely on the bond that a child has with a foster parent, K.H.O., 161 N.J. at 363, and take into account a child's need for a nurturing relationship with an adult. N.J. Div. of Youth & Family Servs.

v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004).  When a bond exists between a child and his or her foster family, and the parent cannot correct his or her behavior, the termination of parental rights will not do more harm than good. E.P., 196 N.J. at 108.

Judge Thompson found the Division demonstrated, by clear and convincing evidence, that all four prongs supported termination of Theresa's parental rights.  These findings were supported by evidence the judge found credible and are entitled to our deference.  N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012); Cesare, 154 N.J. at 413.  We therefore affirm substantially for the reasons set forth by Judge Thompson in his well-reasoned and thoughtful opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0321-18T2